# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| **MARK BOETTCHER,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **Docket No. 1:25-cv-303** |
| ) | |
| **THE LINCOLN NATIONAL LIFE** ) | |
| **INSURANCE COMPANY,** ) | |
| ) | |
| and ) | |
| ) | |
| **TRUSTEES OF** ) | |
| **DARTMOUTH COLLEGE,** ) | |
| ) | |
| and ) | |
| ) | |
| **DARTMOUTH COLLEGE** ) | |
| **TOTAL DISABILITY PLAN,** ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

The plaintiff, Mark Boettcher ("Boettcher"), by and through his undersigned counsel, files this Complaint against Defendants, The Lincoln National Life Insurance Company ("Lincoln"), Trustees of Dartmouth College ("Dartmouth"), and the Dartmouth College Total Disability Plan (As Restated effective October 1, 2008) (the "2008 LTD Plan"). In this lawsuit, Boettcher seeks to clarify his rights under certain employee welfare benefit plans; to recover the full scope of benefits due under those plans; and to recover others damages and expenses incurred as a result of Defendants' conduct, including interest, attorneys' fees, and costs.

## INTRODUCTION

In 2013, Boettcher began work at Dartmouth College as a Senior Programmer Analyst. For the next five years, Boettcher's annual reviews reflected that he consistently met, and at times exceeded, job expectations and requirements. In 2018, Boettcher experienced health issues that exacerbated symptoms of his existing ADHD and otherwise negatively impacted his cognitive functioning. Increasingly, and despite on-going treatment, his symptoms began to significantly impair his ability to successfully perform his role at Dartmouth until, in 2020, Boettcher applied for short-term disability. Lincoln, acting as the agent for Dartmouth, approved Boettcher's application. In 2021, although Boettcher's symptoms had not improved, Lincoln terminated Boettcher's disability benefits, and Dartmouth retroactively terminated his employment. Boettcher has been unable, due to his health, to return to work in any capacity at Dartmouth or elsewhere. Despite extensive testing and documentation by his treating providers of Boettcher's inability to return to work, Dartmouth and Lincoln have unreasonably continued to deny Boettcher the benefits he is due under short-term and long-term disability plans provided by Dartmouth in connection with his employment.

## PARTIES, JURISDICTION, and VENUE

1. Plaintiff Boettcher is a resident of Bethel, Vermont and a former employee of Dartmouth College.
2. Defendant Dartmouth is a New Hampshire nonprofit corporation located at 63 South Main Street, Suite 301, Hanover, NH 03755. Dartmouth is Boettcher's former employer and the Plan Sponsor/Plan Administrator for its employee disability plans.

3. Defendant Lincoln is an Indiana corporation designated by Dartmouth as the Claims Administrator/claims fiduciary to administer claims under Dartmouth's disability plans. Lincoln's home office is located at 1301 S. Harrison Street, Fort Wayne, IN 46802.

4. Dartmouth's 2008 LTD Plan is an employee benefit plan subject to ERISA.

5. Jurisdiction in this Court is proper under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.

6. Venue is proper in this District under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(c)(2), in that Defendants reside or may be found in this District.

## FACTS

7. Dartmouth hired Boettcher in December of 2013 as a Senior Programmer/Analyst, a job which involved juggling multiple projects and deadlines, timely communications among diverse constituents, and adapting to changing project requirements.

8. Boettcher's employee benefits package included, in relevant part, short-term and long-term disability plans.

9. Short-term disability coverage was provided under Dartmouth's Short Term Disability Plan (Jan. 1, 2003) ("the 2003 STD Plan").

10. Dartmouth offers short-term disability benefits at no cost to employees.

11. The 2003 STD Plan provides up to 26 weeks of salary replacement to eligible Dartmouth employees following a short elimination period.

12. Long-term disability coverage was provided under the 2008 LTD Plan.

13. Dartmouth offers long-term disability benefits with fifty percent income-replacement at no cost to employees. Dartmouth also offers employees the opportunity to

purchase upgraded disability coverage at sixty-percent and seventy-percent income-replacement levels.

14. Boettcher elected the seventy-percent coverage level, and his portion of the premiums were deducted from his salary each pay period.

15. Benefits under the 2008 LTD Plan begin after short-term disability benefits have been exhausted.

16. For eligible Dartmouth employees in Boettcher's age group, coverage under the 2008 LTD Plan may continue until age 70.

17. The 2003 STD Plan authorizes the Plan Administrator (Dartmouth) to delegate its responsibilities under the Plan.

18. Dartmouth delegated its claims administration responsibilities to Lincoln.

19. The 2008 LTD Plan authorizes the Plan Administrator (Dartmouth) to delegate its responsibilities under the Plan.

20. Dartmouth delegated its claims administration responsibilities to Lincoln.

21. Under the terms of the 2008 LTD Plan, the Claims Administrator's decision is final.

22. Dartmouth self-insures its disability insurance programs.

23. Both the 2003 STD Plan and the 2008 LTD Plan define disability as "the inability of the Participant to perform the normal duties and responsibilities of his or her position in a satisfactory manner because of a medically determinable physical or mental impairment."

24. After thirty months of disability, the definition of disability under the 2008 LTD Plan is "the inability of the Participant, because of a medically determinable physical or mental impairment, to engage in any substantial gainful activity which other

       individuals of similar age and with similar education, training, and work experience are actually engaged in as a means of financial support."

25. From 2014 to 2018, Boettcher consistently met, and at times exceeded, the expectations for his position.

26. In the fall of 2018, Boettcher was hospitalized for depression and anxiety.

27. Boettcher's diagnoses included ADHD and Cyclothymia.

28. Boettcher struggled to maintain his prior performance at work.

29. Boettcher's 2019 performance review reflected a drop in his overall performance.

30. Despite increased effort at work and frequent visits to his primary care physician, Dr. Annika Brown, Boettcher's symptoms continued to get worse, leading Dr. Brown in August 2020 to refer him for a psychiatric consultation.

31. On September 16, 2020, Dartmouth put Boettcher on a Performance Improvement Plan ("PIP").

32. The performance-related concerns identified in the PIP and the last performance review reflect that Boettcher was struggling to evaluate, organize, and manage assigned projects, maintain focus, adhere to deadlines, and communicate efficiently and effectively with colleagues and stakeholders.

33. The identified challenges closely align with the impairments commonly demonstrated by persons with executive dysfunction caused by ADHD or other medical issues.

34. Acknowledging that his symptoms had increased to the point where his ability to manage his work tasks was significantly impaired, Boettcher applied for short-term disability on September 26, 2020.

35. In support of Boettcher's application, Dr. Brown wrote: "It is my medical opinion that Mark Boettcher is currently disabled by his uncontrolled hypothyroidism complicating his severe attention deficit / hyperactivity disorder."

36. On October 1, 2020, Lincoln requested medical records for Boettcher from Dr. Brown, as well as a Functional Status Evaluation and an estimated return-to-work date. Dr. Brown responded on October 22, 2020, writing that Boettcher's "inattention limits task-completion and appropriate interaction at work" and that he would require additional oversight and modified projects and deadlines to perform his job duties.

37. Treatment of Boettcher's hypothyroidism and adjustments to his ADHD medications did not meaningfully resolve his symptoms, and his function continued to decline.

38. Dr. Brown referred Boettcher for a functional cognitive evaluation.

39. Occupational Therapist Gregory Morneau performed a functional cognitive evaluation on October 27, 2020, and found that Boettcher had performance deficits in all areas of attention and executive function including planning, organizing, task monitoring, and working memory. He also noted in subsequent visits on November 2 and 9 that Boettcher had difficulties with prospective memory, new learning, dual tasking, and sustained attention.

40. On November 18, 2020, an internal Lincoln nursing memorandum stated that given Boettcher's "history of ADHD, abnormal thyroid function, worsening of cognitive decline, demonstrated deficits revealed by cognitive testing, ongoing treatment with OT and endorsement from [Dr. Brown] for time [out of work], it would be reasonable to r/ls of inability to make complex decisions, inability to plan, organize, and

complete tasks, inability to multitask, inability to sustain attention, and inability to retain or learn new information from 9/26/20 through 12/22/20."

41. Lincoln proceeded to approve Boettcher's short-term disability claim for the period covering September 26, 2020, through December 22, 2020.

42. Boettcher's plan of care included weekly occupational therapy with Gregory Morneau to identify deficits and learn coping mechanisms with the goal of returning to his previous work.

43. Between October 2020 and January 2021, Boettcher attended weekly occupational therapy sessions. During these appointments, Gregory Morneau worked with Boettcher on cognitive retraining using therapeutic exercises and activities as well as neuromuscular re-education.

44. To review his eligibility for continued disability benefits, Lincoln requested, and Boettcher provided, additional information, including office treatment notes, test results, and treatment plans from December 1, 2020.

45. On December 23, 2020, Lincoln approved Boettcher's short-term disability extension through January 5, 2021.

46. After Boettcher's appointment on January 5, 2021, Gregory Morneau concluded that based on "objective test deficits," Boettcher was not ready to return to work.

47. As a result of Morneau's conclusion, on January 6, 2021, Boettcher requested further extension of his disability benefits.

48. An internal Lincoln nursing memo dated January 25, 2021, acknowledged Boettcher's limitations: "[f]undamentally, he can do computer programming, but

cannot sustain attention on long projects and does not meet deadlines or expected progress."

49. At Lincoln's request, Boettcher underwent neuropsychological testing on January 28, 2021, with neuropsychologists Dr. Robert Roth and Dr. Janelle Eloi. Dr. Roth wrote, "[t]he reported worsening of his cognition in the past several years may be related to a combination of factors such as current medications (e.g., adjustment of dexmethylphenidate), elevated psychiatric symptoms, situational factors which led to psychiatric hospitalization, and changes in dynamics at work. Of note, his history of substance use disorder and marijuana use may also be affecting his cognitive functioning; however, *his cognitive problems are unlikely to be fully accounted for by these factors*." (emphasis added).

50. On March 15, 2021, Dr. Brown referred Boettcher to Adult Behavioral Health at Alice Peck Day Hospital and DHMC Neurology to pursue a neurologic work-up and psychiatric evaluation based on the neuropsychological testing results.

51. On March 16, 2021, Lincoln denied Boettcher's request to approve disability benefits beyond January 5, 2021. Lincoln stated: "The information provided in a Neuropsychological Evaluation does not support the presence of valid neurocognitive impairment or associated restrictions and limitations."

52. Under Dartmouth's disability plans, Boettcher needed to show that he was unable to perform the duties of his job due to disability.

53. The relevant question, by Dartmouth's own standard, was not his level of function at the time of his evaluation, but whether a decline in function due to disability rendered Boettcher unable to perform the duties of his job.

54. The neuropsychological evaluation does not reflect the degree of decline in Boettcher's cognitive function because no baseline evaluation was available for comparison.

55. Absent Lincoln's refusal to extend approval for benefits, Boettcher would have been eligible for short-term disability benefits through March 24, 2021, and then for conversion to long-term disability benefits through age 70.

56. On March 16, 2021, Dartmouth reminded Boettcher that his FMLA leave ended on December 18, 2020, and provided information about returning to work.

57. However, on April 6, 2021, Boettcher learned that Dartmouth retroactively terminated his employment as of January. With pay in lieu of notice provided, Boettcher's official end of employment date was February 2, 2021.

58. Dartmouth's explanations for the termination of Boettcher's employment were contradictory.

59. Dartmouth claimed that it could no longer hold open his position, although Dartmouth had not previously informed Boettcher his employment would terminate if he was unable to return to work by a certain date.

60. Dartmouth also claimed that the "operational needs" of Boettcher's department had changed and that "[t]he position you held has been eliminated as part of a reorganization of responsibilities and redefinition of roles."

61. Although Dartmouth professed that the reorganization was not related to Boettcher's leave of absence, the letter also stated that his employment termination would be reversed if he succeeded in appealing the denial of short-term disability benefits.

62. Around the time he was notified that his employment had been retroactively terminated, allegedly because his position had been eliminated, Boettcher was contacted by a recruiter who shared with him a Dartmouth job notice for a position nearly identical to the one he had held.

63. Boettcher requested a copy of the relevant disability plan documents from Lincoln; however, Lincoln responded on June 1, 2021, that the plan documents must be provided by the Plan Administrator.

64. Dartmouth is the Plan Administrator on the disability plans.

65. On June 3, 2021, Boettcher requested a copy of the applicable plan documents from Dartmouth.

66. On June 8, 2021, Dartmouth identified the 2003 STD Plan and the 2008 LTD Plan as the applicable plan documents and provided copies.

67. Boettcher eventually realized that Lincoln, in its role as Claims Administrator, had been evaluating Boettcher's claims under a different short-term disability policy than the 2003 STD Plan produced by Dartmouth in response to Boettcher's request and under a different long-term disability policy (a 2018 Group Disability Income Policy for which Dartmouth is identified as the "Sponsor") than the 2008 LTD Plan produced by Dartmouth in response to Boettcher's request.

68. The policies provided by Dartmouth to Boettcher are not the same as the policies and contain different terms, including different definitions of disability, than those Lincoln used to evaluation Boettcher's claims.

69. Lincoln relied on inapplicable standards and unreasonably cherry-picked facts favorable to its position to justify its decision to deny further disability benefits.

70. Lincoln repeatedly and arbitrarily discounted Boettcher's "self-reported" evidence of symptoms and deficits and questioned the validity of the "objective" testing and observations from his treating providers.

71. Lincoln erroneously claimed that Boettcher was capable of work because his records reflected that he had been repairing a cabin and that he used to have a part-time antiques business. The standard under the Dartmouth's disability plans is not whether Boettcher was capable of some work, but whether he was capable of performing his specific role at Dartmouth, which he was not.

72. Moreover, as Boettcher on multiple occasions explained to Lincoln, the references to his physician were taken out of context and misleading. The antiques business closed in 2015 and offered no insight about Boettcher's ability to perform an entirely different role in 2021. And a closer look at the "work" on the cabin—consisting of a handful of days over a period of months during which Boettcher's symptoms prevented him from completing or even making meaningful progress on any projects—supports a finding of continued disability.

73. Lincoln willfully ignored his explanations and continued to improperly rely on the cabin and antiques "work" as a basis for denying Boettcher's disability claim.

74. Boettcher presented Lincoln with substantial evidence that he was unable to perform the duties of his job due to a disability, including employment evaluations reflecting slipping performance in 2019 and 2020; the September 2020 PIP noting recent concerns around late projects and incomplete written project documentation, lack of attention to detail, challenges around listening, and difficulty remaining focused or "on topic"; and medical testing and treatment notes confirming impairment in

attention, memory, and executive function. The story told by his work performance and medical records presents a stark picture of an intelligent individual, previously functioning at a high level, becoming increasingly unable to reliably access and sustain the cognitive and executive functions necessary to successfully meet the rigorous demands of his job.

75. According to Boettcher's supervisor, Boettcher's position at Dartmouth "requires the highest level of professional ability and skill." In particular, his position required a high degree of executive function as well as intact visual learning and memory.

76. Boettcher has demonstrated impairment in those areas.

77. Lincoln unreasonably failed to adequately review and compare the clinical findings around Boettcher's functional capacity to the requirements of his prior role at Dartmouth or even similar careers in the computer industry, all of which demand a high degree of functional capacity beyond what Boettcher was (and is) able to sustain in the workplace.

78. In July of 2022, Boettcher appealed Lincoln's decision to deny short-term disability benefits beyond January 5, 2021.

79. In January 2023, Lincoln denied the appeal.

80. In September of 2023, Boettcher applied for benefits under the long-term disability plan and provided Lincoln with updated medical records.

81. On October 23, 2023, Lincoln denied Boettcher's application for long-term disability benefits, stating there was "no supporting psychiatric, medical, or neurodegenerative process to account for the self-reported cognitive impairment."

82. Boettcher's treating providers frequently concluded that his cognitive decline and reduced work capacity was likely more complicated than ADHD alone.

83. Throughout this process, Boettcher continued to work with his treating providers to further refine his diagnosis and seek appropriate treatment.

84. Since his termination in March of 2021, Boettcher has been unable to work on home projects that require any consistent and sustained effort, much less outside employment of any kind.

85. On December 21, 2023, Boettcher's treating psychiatrist stated: "It is likely that patient's age, premorbid ADHD, and age related cognitive changes are combining to create the above presentation. As such the long term prognosis is guarded at this time. While I do not expect that cognitive changes will continue to worsen. However at this time there is no treatment that I can provide that will get patient back to baseline functioning or that will allow him to resume to his prior career even part time."

86. Lincoln has relied on "record reviews" by non-treating providers to conclude that Boettcher is not entitled to further benefits under the short-term or long-term disability plans.

87. Lincoln has consistently ignored or discounted the opinions of Boettcher's treating providers and the opinion of an occupational medicine expert who specializes in returning individuals with disabilities or injuries to the workplace.

88. Had Lincoln requested that Boettcher submit to an in-person Independent Medical Exam, the extent of Boettcher's disability would have been readily apparent.

89. ERISA was enacted to promote the interests of participants in employment benefit plans. It sets minimum standards and procedures to ensure that participants receive "adequate notice," "a reasonable opportunity for a full and fair review," and judicial review of a termination of benefits.

90. ERISA requires that benefit plans identify fiduciaries who will have authority to control and manage the plans and who will be required to act solely in the interest of participants and beneficiaries.

91. Defendants' conduct falls below the minimum standards and procedures required.

**Count I**
**Failure to Disclose Plan Documents**

92. Plaintiff incorporates paragraphs 1 to 91, above.

93. The disability plans used by Lincoln to evaluate Boettcher's claims are subject to ERISA.

94. Plan Administrators have an obligation under ERISA to supply plan information to participants upon request.

95. Defendants violated ERISA by providing plan documents other than those which were apparently used to evaluate Boettcher's application for disability benefits.

96. Although Boettcher meets the definition of disability under any of the plans, his claims should be evaluated under the terms of the 2003 STD Plan and 2008 LTD Plan.

97. Defendants' improper conduct caused harm to Boettcher.

## Count II
## Breach of the 2003 STD Plan

98. Plaintiff incorporates paragraphs 1 to 97.

99. Dartmouth provides disability coverage as part of its benefits package to qualifying employees, including short-term disability.

100. The 2003 STD Plan creates a contract between Dartmouth and Boettcher promising that Dartmouth will make payments to Boettcher if he is unable to work because of a disability.

101. The terms of the 2003 STD Plan provide that the plan is not governed by ERISA.

102. Dartmouth delegated certain obligations under the contract to Lincoln.

103. Boettcher, at all relevant times, has demonstrated the existence of a disability and functional impairments that rendered him unable to perform the duties of his position within the meaning of the 2003 STD Plan.

104. Defendants breached the agreement by refusing to continue short-term disability benefits through March 24, 2021, and instead terminating benefits after January 5, 2021.

105. Boettcher was harmed as a result of Defendants' breach.

106. Boettcher is entitled to recover, in addition to other damages and appropriate relief, the benefits improperly denied by Defendants between January 5, 2021, and March 24, 2021.

## COUNT III
## ERISA Action for Benefits Due Under Alternate Short-Term Disability Plan

107. Plaintiff incorporates paragraphs 1 through 106, above.

108. Dartmouth provides disability coverage as part of its benefits package to qualifying employees, including short-term disability.

109. Boettcher asserts that the terms of the 2003 STD Plan apply to his application for short-term disability benefits; however, Lincoln evaluated Boettcher's application under a different short-term disability plan.

110. The short-term disability plan relied on by Lincoln in its evaluation of Boettcher's claim is an "employee welfare benefit plan" subject to the Employee Retirement Income Security Act ("ERISA").

111. At all relevant times, Boettcher was a participant in the plan.

112. At all relevant times, Boettcher has been disabled within the meaning of the plan.

113. Dartmouth delegated responsibility for Claims Administration to Lincoln.

114. Dartmouth and Lincoln are fiduciaries under the plan.

115. ERISA fiduciaries have a duty to act solely in the interest of the participants and beneficiaries.

116. Defendants' actions were not undertaken solely in the interests of the participants or with the "care, skill, prudence, and diligence … that a prudent man acting in a like capacity and familiar with such matters would use" as required under ERISA.

117. Defendants breached their fiduciary duties under ERISA by failing to comply with required minimum claim procedures during the claims-review process, and, as the failure was not harmless or inadvertent, the decision to deny benefits is not entitled to deference.

118. Even if Defendants' decision was entitled to deference, the decision was arbitrary and capricious and an abuse of discretion.

119. Defendants' denial of disability benefits to Boettcher beyond January 5, 2021, was in violation of ERISA.

120. Plaintiff seeks to clarify and enforce his rights under the terms of the plan and to obtain recovery of benefits due and other appropriate relief under the plan.

## Count IV
## ERISA Action to Recover Benefits Due Under Long-Term Disability Plan

121. Plaintiff incorporates paragraphs 1 through 120, above.

122. Dartmouth provides disability coverage as part of its benefits package to qualifying employees, including long-term disability.

123. The 2008 LTD Plan offered by Dartmouth is an "employee welfare benefit plan" subject to ERISA; alternatively, the 2018 Group Disability Income Policy is an employee welfare benefit plan subject to ERISA.

124. At all relevant times, Boettcher was a participant in the long-term disability plan.

125. At all relevant times, Boettcher has been disabled within the meaning of the plan.

126. At all relevant times, Dartmouth has been the Plan Administrator, and Lincoln has been the Claims Administrator.

127. At all relevant times, Dartmouth and Lincoln were fiduciaries under the Plans.

128. ERISA fiduciaries have a duty to act solely in the interest of the participants and beneficiaries.

129. Defendants' actions were not undertaken solely in the interests of the participants or with the "care, skill, prudence, and diligence … that a prudent man acting in a like capacity and familiar with such matters would use" as required under ERISA.

130. Defendants breached their fiduciary duties under ERISA by failing to comply with required minimum claim procedures during the claims-review process, and, as the failure was not harmless or inadvertent, the decision to deny benefits is not entitled to deference.

131. Even if Defendants' decision concerning Boettcher's application for long-term benefits was entitled to deference, the decision was arbitrary and capricious and an abuse of discretion.

132. Defendants breached their fiduciary duties under ERISA by improperly denying benefits to Boettcher under the 2008 LTD Plan or, in the alternative, under the 2018 Group Disability Income Policy.

133. Plaintiff seeks to clarify and enforce his rights under the terms of the plan and to obtain recovery of benefits due and other appropriate relief under the plan.

**Requested Relief**

Plaintiff demands relief as follows:

1. A declaration that the 2003 STD Plan and the 2008 LTD Plan provide the applicable terms and conditions to evaluate Boettcher's claims for benefits.
2. Damages, including short- and long-term disability benefit payments to which he was entitled.
3. An award of costs including reasonable attorney's fees.
4. Interest.
5. Appropriate equitable and injunctive relief.
6. Such other amounts as are just and equitable.

                                                Respectfully submitted,

                                                VITT & NUNAN, PLC

Date: <u>August 12, 2025</u>             By:    <u>/s/ Geoffrey J. Vitt</u>
                                                                 Geoffrey J. Vitt (NH Bar #9095)
                                                                  8 Beaver Meadow Road
                                                                  P.O. Box 1229
                                                                  Norwich, VT 05055-1229
                                                                  (802) 649-5700
                                                                  gvitt@vittnunanlaw.com

                                                                *Counsel for Mark Boettcher*